UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Tylon Reddick,<br>    *Plaintiff*,<br><br>    *v.*<br><br>Theresa C. Lantz, Bruce J. Cuscovitch, John P. Tarascio, Michael P. Lajoie, Omprakash Pillai, Edwin Njoku, and Correctional Officer John Does 1–5,<br>    *Defendants.* | Civil No. 3:07cv1793 (JBA)<br><br><br><br>March 29, 2010 |

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. # 26]

In his amended complaint filed July 29, 2008, Plaintiff Tylon Reddick, proceeding *pro se*,[1] alleges that Defendants Theresa C. Lantz, Bruce J. Cuscovitch, John P. Tarascio, Michael P. Lajoie, Dr. Omprakash Pillai, Dr. Edwin Njoku, and Correctional Officers John Does 1–5 were deliberately indifferent to his serious medical needs. He seeks damages only. Defendants have moved for summary judgment on all claims, which, for the reasons that follow, will be granted.

I.    Facts[2]

The incidents underlying this action occurred between August 25, 2004 and May 5, 2005. During this period, Reddick was incarcerated at four correctional facilities: at J.B. Gates Correctional

---

[1] Counsel was appointed for the limited purpose of assisting Reddick in determining proper defendants, alleging their personal involvement in his claims, and filing an amended complaint. (*See* Appointment of Pro Bono Counsel [Doc. #8].)

[2] The facts are taken from Defendants' Local Rule 56(a)1 Statement [Doc. # 26-4] and attached exhibits. In accordance with Local Rule 56(b), Defendants filed a Notice to Pro Se Litigant Opposing Motion for Summary Judgment [Doc. # 26-5] informing Reddick of his obligation to respond to the motion as well as the contents of a proper response. Reddick filed a document entitled "Opposing Motion for Summary Judgment to # 26" [Doc. # 27], but he neither submitted a Local Rule 56(a)2 Statement, nor proffered any evidence in opposition to summary judgment.

Institution ("J.B. Gates") from August 19 through October 13, 2004; at Corrigan–Radgowski Correctional Center ("Corrigan") from October 13 through November 19, 2004; at Bergin Correctional Institution ("Bergin") from November 19 through December 21, 2004; and at Osborn Correctional Institution ("Osborn") from December 21, 2004, through his discharge to parole on July 5, 2005.

In 1996, Reddick suffered a gunshot wound to his abdomen that damaged his biliary system. The wound required surgical intervention, including surgical reconnection of the hepatic duct and the small intestine, a colostomy and a subsequent colostomy reversal. The bullet remains lodged near Reddick's liver.

On August 25, 2004, after complaining of yellow eyes, light stools, and some nausea, Reddick was seen by Dr. Michael Alper at J.B. Gates for jaundice. Dr. Alper ordered screening tests for Hepatitis, which came back negative, and liver function studies, which revealed elevated levels.

Two days later, on August 27, 2004, Reddick was seen by Dr. Douglas Bruce, an infectious disease consultant, at J.B. Gates's Infectious Disease Clinic. Dr. Bruce reviewed Reddick's medical history and noted that his liver function studies had been elevated off and on since 1997. He opined that the elevated levels could be caused by a virus or an obstruction, and ordered repeat liver function studies and virus serology studies. Dr. Bruce saw Reddick again on September 15, 2004. All viral studies were negative, but there was a slight increase in liver function levels. Dr. Bruce recommended repeat Hepatitis testing in four weeks in case the previous tests were done too early to detect the Hepatitis antibody.

On October 13, 2004, Reddick transferred from J.B. Gates to Corrigan. The repeat Hepatitis testing, done on October 20, 2004, again came back negative, and Reddick's liver function levels were higher. At Corrigan, Reddick complained of some nausea, vomiting, itching, cold sweats, and dark urine. Dr. Ganpat Chouhan examined Reddick on November 16, 2004. Because a bullet remains lodged near Reddick's liver, Dr. Chouhan considered that his symptoms might be caused by a biliary obstruction related to the gunshot wound and prior surgeries. Dr. Chouhan ordered an abdominal x-ray and additional blood tests. The abdominal x-ray, taken the following day, showed no evidence of gallstones, no soft tissue mass, and a normal bowel gas pattern. The radiologist recommended an ultrasound if the doctor suspected a bile duct obstruction as the cause of Reddick's symptoms.

On November 19, 2004, Reddick was transferred to Bergin. Reddick sought treatment at the medical clinic. He was examined by defendant Dr. Pillai on November 24, 2004. Dr. Pillai reviewed and charted the results of Reddick's liver function studies over time and noted the negative abdominal x-ray. Dr. Pillai's initial diagnosis was recurrent Hepatitis with an obstructive pattern probably resulting from structural abnormalities from the 1996 gunshot wound and surgeries. He ordered follow-up liver function studies and indicated he would consider requesting Utilization Review Committee ("URC") approval for an ultrasound or Endoscopic Retrograde Cholangiopancreatography ("ERCP").

Dr. Pillai again examined Reddick on December 8, 2004. He noted that the most recent liver function studies showed some improvement. Because Reddick continued to experience nausea,

3

itching, and intermittent jaundice, Dr. Pillai requested URC approval for an ultrasound or ERCP. On December 14, 2004, the URC approved the ultrasound, with the test to be scheduled by staff at the University of Connecticut Health Center.

On December 21, 2004, Reddick was transferred to Osborn, where he was seen by defendant Dr. Njoku on January 8, 2005 for complaints of fatigue and weight loss.  Dr. Njoku ordered Prednisone as a precaution in case Reddick had a non-viral form of Hepatitis, and Vistaril for itching.  Dr. Njoku also noted that Reddick had been approved to undergo an ultrasound.  Reddick did not report for sick call appointments on January 11 and 14, 2005.

Reddick underwent the ultrasound on January 21, 2005.  The test showed intrahepatic ductal dilatation and common duct dilatation and an undistended gall bladder.  These results suggested an obstruction of the biliary system.  Further evaluation, either by ECRP or Magnetic Resonance Cholangiopancreatography ("MRCP"), was recommended.

On January 24, 2005, the URC approved further evaluation by ERCP, to be scheduled by University of Connecticut Health Center staff.  The same day, Dr. Pillai ordered monthly liver function studies.  On January 26, 2005, Dr. Pillai prescribed medication to relieve Reddick's gas pains.  He also prescribed vitamin K because liver problems can cause coagulation issues.

The ERCP was performed on February 9, 2005.  The tube was passed successfully into the pancreatic duct. This allowed dye to be injected and resulted in good visualization. The pancreatic duct was normal. When the doctor performing the test tried to pass the tube into the common bile duct, Reddick became agitated and the procedure was halted.  The doctor recommended that the

ERCP be repeated with Reddick under anesthesia and suggested that a CT scan be done before the second ERCP.  The URC approved both recommendations on February 17, 2005.

The CT scan of Reddick's abdomen was performed on March 3, 2005.  The test showed a dilated intrahepatic and common bile duct.  In preparation for the second test under anesthesia, Dr. Pillai conducted a pre-op physical of Reddick on March 10, 2005.  A chest x-ray, done as part of the physical, showed a normal chest and the bullet lodged within the soft tissue of the abdominal wall.

On March 16, 2005, Reddick was taken to the John Dempsey Hospital at the University of Connecticut Health Center for a percutaneous transhepatic cholangiogram.  The procedure revealed a complete occlusion of the common bile duct.  Doctors inserted a biliary drainage catheter and admitted Reddick as an inpatient.  During the hospitalization, Reddick was treated for his biliary system problems as well as other medical issues that arose after his admission.  X-rays taken after his admission showed a large right pleural effusion and a pelvic abscess.  Neither condition was present during the pre-op physical on March 10, 2005.

On March 22, 2005, the pelvic abscess was successfully drained and a thoracentesis was performed to aspirate fluid from Reddick's right pleural space.  The following day, a balloon dilation of the common bile duct was performed.  The procedure resulted in only minimal improvement.  When the thoracentesis failed to correct the pleural effusion, Reddick underwent surgery to remove adhesions and thick effusions trapping the lung.  This procedure, performed on April 1, 2005, was successful.

On April 19, 2005, after the lung and abscess issues were addressed and Reddick's condition stabilized, he underwent surgery to remove scar tissue that had formed at the site of the 1996 surgery, and to reconnect the hepatic duct to the small intestine. Multiple intrahepatic gallstones also were removed during this procedure. Reddick developed an infection at the incision site after surgery, which necessitated a further procedure to reopen, drain, irrigate, and re-pack the wound.

Reddick was discharged from the hospital on May 5, 2005, and returned to Osborn. At that time he was eating a regular diet, his wound was healing, his lungs were clear, his heart was regular, he was voiding appropriately, and the percutaneous transhepatic catheter was draining minimal amounts of fluid. At a follow-up visit in June 2005, the wound was described as healing relatively well and the drain was removed.

Reddick was released to parole on July 5, 2005. When he was readmitted to custody in February 2006, he had developed a ventral hernia at the intersection of his surgical scars. The hernia, commonly occurring following abdominal surgery, was examined and found to be non-tender and easily reducible.

II.     Standard

"Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing

law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III.    Discussion

In his amended complaint, Reddick argues that Defendants were deliberately indifferent to his serious medical need and that he was not provided proper medical care by the doctors at the University of Connecticut Health Center. Reddick also contends that the supervisory defendants created a policy and custom that would ensure that inmates are deprived of adequate medical care and failed to supervise and train the medical staff. Defendants move for summary judgment on all claims, arguing that (1) the claims against all defendants identified only as John Doe as well as the claims against defendants Cuscovitch, Tarascio and Lajoie are time-barred; (2) the record reveals no evidence supporting a claim for supervisory liability; (3) no defendant was deliberately indifferent to Reddick's serious medical needs; and (4) the defendants are protected by qualified immunity.

    A.    The John Doe Defendants

The statute of limitations on actions brought in Connecticut under 42 U.S.C. § 1983 is three years. *Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994); Conn. Gen. Stat. § 52-577; *see also Walker v. Jastremski*, 430 F.3d 560, 561, 562 (2d Cir. 2005). Any correctional officer's involvement in the conduct of which Reddick complains would have concluded on March 16, 2005 (the day Reddick was admitted to John Dempsey Hospital), so the limitations period for any claims based on that conduct ended three years later, on March 16, 2008—before Reddick filed his amended

complaint on July 29, 2008, but after he first filed suit on December 5, 2007. However, Reddick has not yet identified any of the John Doe defendants, and even if he were to name them now—after the end of the three-year limitations period—his claims against them would not relate back to the date of the original pleading, and therefore would be time-barred. *See id.*; *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 469–70 (2d Cir. 1995), *modified*, 74 F.3d 1366, 1367 (2d Cir. 1996) ("Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities"). Any claims against the John Doe defendants being time-barred, these defendants are entitled to summary judgment.

    B.  Deliberate Indifference to a Serious Medical Need

Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on such a claim, Plaintiff must provide evidence of sufficiently harmful acts or omissions and intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. *Id.* at 104–06.

Because mere negligence will not support a Section 1983 claim, not all lapses in prison medical care constitute a constitutional violation. *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003). In addition, inmates are not entitled to the medical treatment of their choice. *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment. "So

8

long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). The conduct complained of must "shock the conscience" or constitute a "barbarous act." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

"There are two elements to a claim of deliberate indifference to a serious medical condition: The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citations and internal quotations omitted). For Reddick's claim to survive summary judgment, the record must contain evidence on which a reasonable juror could conclude that Defendants were deliberately indifferent to his medical condition,[3] "which . . . means that [they] 'kn[ew] of and disregard[ed] an excessive risk to [Reddick's] health or safety' and that [they were] 'both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *see also Chance*, 143 F.3d at 703 ("the deliberate indifference standard requires the plaintiff to prove that the prison official knew of and disregarded the plaintiff's serious medical needs").

Medical judgment usually is not sufficient to support an Eighth Amendment violation. *See Hernandez v. Keane*, 341 F.3d 137, 146–47 (2d Cir. 2003) (summary judgment appropriate where deliberate indifference claim relied on delay in providing risky treatment), *cert. denied*, 543 U.S.

---

[3] Defendants do not contest, and the Court therefore assumes without deciding, that Reddick suffered from a "serious medical condition."

9

1093 (2005). The judgment of prison doctors is presumed valid unless the prisoner provides evidence that the decision was "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990).

In addition, physicians can and do differ in their diagnoses and their determinations of the appropriate treatment for a particular patient. That difference of opinion does not establish a claim of deliberate indifference. *See Estelle*, 429 U.S. at 107 (holding that questions of diagnosis and treatment implicating medical judgment are at most medical malpractice, not deliberate indifference to serious medical needs). Thus, the mere fact that treating physicians considered two possible diagnoses does not establish deliberate indifference to serious medical needs. Further, Reddick's own opinion that Defendants failed to provide proper medical care does not state a constitutional claim. A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *See Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.").

Defendants proffer copies of Reddick's medical records relevant to this claim and the affidavits of Dr. Bruce M. Brenner, a board certified surgeon and Assistant Professor of Surgery at the University of Connecticut Health Center; Dr. Mark Buchanan, Director of Medical Services for the Correctional Managed Health Care Program; and Dr. Pillai. Dr. Brenner stated that Reddick's condition involved a complex diagnostic process requiring consistent monitoring of his liver

10

function levels along with other diagnostic tests, all of which were done. During the time before he was hospitalized, both Reddick's test results and the severity of his symptoms fluctuated. Dr. Brenner opines that the fluctuations were the result of intrahepatic gallstones which intermittently blocked the common bile duct. When the duct was blocked, the liver function levels were elevated and other symptoms increased. When the duct was not blocked, liver function levels decreased and other symptoms became less noticeable.

The other conditions treated while Reddick was hospitalized—the pleural effusion and pelvic abscess—were not present during the pre-op physical conducted a few days before his admission to the hospital. The medical records reveal that Reddick's primary complaints prior to his hospital admission were itching and jaundice. When Hepatitis testing continued to be negative, the doctors requested tests appropriate to determine whether the symptoms were caused by an obstruction of the bile duct. The URC approved all requested tests.

Reddick specifically names as defendants only Drs. Pillai and Njoku. Dr. Brenner opines that all treatment providers, including Dr. Pillai, acted reasonably, appropriately, and within accepted professional standards regarding his monitoring and care of Reddick and his diagnostic referrals. Dr. Njoku treated Reddick only once, for his complaints of dry skin, fatigue, and weight loss. Dr. Njoku prescribed medication for viral Hepatitis, since that diagnosis was still being considered, as well as a medication for itching. At the time Dr. Njoku saw him, Reddick already was being scheduled for an ultrasound to investigate further the other possible cause for his symptoms. Dr.

Buchanan avers that these actions were appropriate and in accordance with accepted standards of care.

Reddick has not provided any contrary medical opinion suggesting that he was improperly treated or identifying any actions of Drs. Pillai and Njoku that were not in accordance with acceptable medical standards. Although Reddick alleges that he suffered severe pain during this period, the medical records include only two references to pain. On August 27, 2004, Reddick reported experiencing abdominal pain that had stopped before he saw the doctor. On January 4, 2005, and again on January 26, 2005, Reddick was prescribed medication for complaints of severe gas pains. Reddick also reports that he experienced severe weight loss. There is only one reference to a complaint of weight loss in the medical records, but no quantifying information. Reddick has proffered no evidence in opposition to summary judgment to support his allegations that he complained of but was not treated for severe pain throughout the relevant time period, or that he experienced severe weight loss that was ignored by medical staff.

Reddick's disagreement with the medical treatment he received, without evidence that the treatment constituted unacceptable medical care or demonstrated failure to apply reasonable professional judgment, is insufficient to support a claim for deliberate indifference to serious medical needs. Accordingly, Defendants' motion for summary judgment is granted on this claim.

C.   Supervisory Defendants

Defendants Lantz, Cuscovitch, Tarascio, and Lajoie are supervisory defendants. Lantz was the Commissioner of the Connecticut Department of Correction during the relevant time period

and Tarascio and Lajoie were wardens at J.B. Gates and Corrigan, respectively, during the times that Reddick was confined at those facilities. Cuscovitch became the warden at Carl Robinson Correctional Institution in February 2006, after the conclusion of the time period relevant to this action. Reddick does not allege that Cuscovitch was the warden at any facility where he was confined between August 25, 2004 and May 5, 2005, the period underlying this action. These defendants argue that Reddick fails to establish a claim for supervisory liability against them. The Court agrees. The Court having concluded that no reasonable juror could conclude that Reddick was subjected to deliberate indifference to his serious medical needs, there can be no claim for supervisory liability. Absent an underlying constitutional violation, there is no cognizable claim for supervisory liability. *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999).

Even if the Court were to assume that Reddick suffered a constitutional deprivation, the record still does not support his supervisory-liability claim. It is settled law that in a § 1983 civil-rights action for monetary damages against a defendant in his individual capacity, a plaintiff must demonstrate the defendant's direct or personal involvement in the actions which are alleged to have caused the constitutional deprivation. Because "[i]t is well settled . . . that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity," *Hayut v. State Univ. of New York*, 352 F.3d 733, 753 (2d Cir. 2003) (citing *Monell*, 436 U.S. at 691), supervisors are not automatically liable under section 1983 when their subordinates commit constitutional torts. To survive summary judgment on a

claim against a supervisor, the record must contain "[e]vidence of a supervisory official's 'personal involvement' in the challenged conduct." *Id.* (citation omitted).

> "Personal involvement" is not limited to direct participation by the supervisor in the challenged conduct, but may also be established by evidence of an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates.

*Id.* In addition, the plaintiff must demonstrate an affirmative causal link between the action or inaction of the supervisory official and his injury. *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

Reddick does not allege, and the record contains no evidence of, any personal involvement by Lantz, Cuscovitch, Tarascio, or Lajoie in Reddick's care, or that these defendants knew of Reddick's medical condition or treatment. Moreover, even if Reddick had written to one of these defendants, the fact that a supervisory official ignored a prisoner's letter of protest or referred the letter to other officials for response does not establish the requisite personal involvement of the supervisory official. *See Brooks v. Chappius*, 450 F. Supp. 2d 220, 226 (W.D.N.Y. 2006) (citing cases).

Reddick argues that the supervisory defendants created the policies governing his medical treatment, but he provides no evidentiary support for this assertion. Medical treatment for inmates is provided by the University of Connecticut Health Center's Correctional Managed Health Care Program, which hires, trains, and supervises the doctors and nurses who provide inmate medical care at all state correctional facilities. The record does not support any conclusion that Lantz, Cuscovitch, Tarascio, or Lajoie were personally involved in the hiring, training, or supervision of the doctors who provided Reddick's medical care, or that any of them created or approved a policy

encouraging, requiring, or resulting in any person's deliberate indifference to any inmate's medical need, or that Reddick was subjected to any such policy. Because the record does not support any supervisory-liability claim against defendants Lantz, Cuscovitch, Tarascio, and Lajoie, summary judgment must be granted in their favor.

IV.     Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment [Doc. # 26] is GRANTED.

The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of March, 2010.